**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY JUSTICE and 5TH WHEEL RECORDS, INC. and MY HEARTLAND PUBLISHING, LLC, *each individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> UNCHARTED LABS, INC., d/b/a Udio.com., <br><br> Defendant | Case No. 1:25-cv-5026 <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Anthony Justice ("Plaintiff Justice"), 5th Wheel Records, Inc. ("5th Wheel Records"), and My Heartland Publishing, LLC ("My Heartland") (collectively "Plaintiffs"), each individually and on behalf of all others similarly situated, by and through their undersigned counsel, file this First Amended Complaint against Uncharted Labs, Inc. d/b/a Udio.com ("Udio") and allege as follows:

**NATURE OF THE ACTION**

1.      Udio is the creator of and markets an artificial intelligence ("AI") model for generating music. Udio's AI model was trained on vast amounts of existing music from online platforms, which are then used to produce new songs that – in some cases – almost exactly replicate the sound, style, and voices of real artists, competing directly with music creators and their copyrighted works.

2.      On June 24, 2024, the world's largest record labels, UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Arista Music, Arista Records LLC, Atlantic Recording

Corporation, Rhino Entertainment Company, Warner Music Inc., Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, and Warner Records/SIRE Ventures LLC, filed a lawsuit[1] against Udio in the United States District Court for the Southern District of New York (the "Lawsuit"), alleging copyright infringement for willfully using copyrighted sound recordings (hereafter "music" or "songs") to train Udio's artificial intelligence ("AI") music generator.

3.      While this high-profile Lawsuit continues to draw attention for its implications on major record label music, it is independent artists whose exclusive rights in their sound recordings and their underlying compositions (hereinafter their "music" or "songs") have been trampled most severely.

4.      Independent artists remain sidelined, unrepresented, and deprived of a meaningful remedy.

5.      While Udio has openly and unapologetically admits in its Answer to the Lawsuit that its AI music generator is trained using "publicly available" sources,[2] these songs are by majority owned and controlled by Independent artists such as Plaintiffs, Class Members, and Subclass Members (as defined herein).

6.      Udio's actions were not only unlawful, but an unconscionable attack on the music community's most vulnerable and valuable creators.

7.      Independent artists such as Plaintiffs, Class Members, and Subclass Members will never be able to claw back the intellectual property unlawfully copied by Udio and used to train its AI.

---

[1]    *See UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 24-04777, Complaint, Doc. No. 1 (S.D.N.Y., Filed June 24, 2024).
[2]    *See UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 24-04777, Answer of Defendant Uncharted Labs, Inc. to Complaint at p. 19, ¶¶ 41, 43, Doc. No. 26  (S.D.N.Y., Filed Aug. 1, 2024)

8.     Once AI ingests copyrighted music, those songs are stored in its neural network, and not capable of deletion or retraction.

9.     These acts by Udio were abuse and exploitation of the worst kind of copyrighted songs owned by Plaintiffs, Class Members, and Subclass Members.

10.     Rather than license these copyrighted songs like other AI Companies have already done, Udio elected to simply steal Plaintiffs', Class Members', and Subclass Members' songs.

11.     Udio accessed some of these songs by unlawfully "stream ripping" them from the streaming platform YouTube.

12.     Udio circumvented the YouTube technological measures by trafficking in devices that are designed specifically to unlock protected media and gain access to the underlying audio-visual files contained in YouTube videos.

13.     Udio AI model(s) has generated AI-soundalike music based on the songs of Plaintiffs, Class Members, and Subclass Members (hereafter the "infringing works").

14.     Udio's AI model(s) created infringing works at virtually no cost to Udio.

15.     Udio, as part of its answer in the Lawsuit, argues that despite clear copyright infringement of music creator's rights, the doctrine of fair use, a defense to copyright infringement pursuant to 17 U.S.C. § 107, shields Udio from any liability.

16.     This categorical "*per se* fair use" defense by Udio fails to account for, and conveniently ignores, the end purpose analysis for AI training.

17.     Meaning, Udio focuses on the curation and ingestion process as the driving factors behind the alleged transformative process triggering fair use.

18.     However, and according to the Supreme Court, the *end purpose* is one of the most

important aspects of the analysis.[3]

19.    As it relates to AI specifically, the most relevant and influential agency in the United States as it relates to matters concerning copyright, the U.S. Copyright Office, recently undertook to research and analyze the issue of whether the training of AI models on copyrighted works qualifies as fair use.

20.    The U.S. Copyright Office released its pre-publication report, Copyright and Artificial Intelligence, Part 3: Generative AI Training (the "Report") in May of 2025.

21.    As discussed more herein, the Copyright Office emphasized that the fair use doctrine does not excuse unauthorized training on expressive works (e.g., music) particularly when those works are used to generate substitutional outputs that may replace the originals in the relevant marketplace.[4]

22.    The Supreme Court in *Andy Warhol Foundation* tightened the "purpose and character" analysis of fair use, where a secondary work serves substantially the same purpose and targets the same audience as the original; confirming that a commercial secondary use serving the same function and audience weighs strongly against fair use. Adding that stylistic changes do not excuse appropriation when the result competes in the same market.[5]

23.    As the Recording Industry Association of America aptly summarized, "there's nothing fair about stealing an artist's life's work, extracting its core value, and repackaging it to compete directly with the originals, as the Supreme Court just held in its landmark Warhol

---

[3]    *See Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) ("The same copying may be fair when used for one purpose but not another"); *see also Google LLC v. Oracle America, Inc.,* 141 S. Ct. 1183, 1197-98 (2021) (holding that Google's copying of portions of Oracle's Java API code constituted fair use because the code was used in a transformative way to create a new platform – Android - for smartphones, thereby serving a different purpose than the original).

[4]    Report at pp. 107-108.

[5]    *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532–33 (2023).

Foundation case."[6]

24.    Udio's business model which takes songs freely available on the Internet and repackages them into competing AI-generated songs epitomizes the very conduct that *Warhol* and other courts make clear is not fair use.[7]

25.    Udio training its AI model on the songs of Plaintiffs, Class Members and Subclass Members without authorization, to then create competing music in the exact same marketplace, does not qualify for fair use and therefore constitutes copyright infringement.

26.    Other courts are echoing the principle that bad-faith conduct cannot be laundered into fair use simply because the end use is claimed to be transformative.

27.    Not only did the *Authors Guild v. Google* court stress that fair use requires lawful acquisition of works before transformative application,[8] but similarly in *Bartz v. Anthropic PBC*, the court rejected the notion that pirated inputs could ever qualify for fair use, noting it "doubts that any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites that it could have purchased or otherwise accessed lawfully was itself reasonably necessary to any subsequent fair use. There is no decision holding or requiring that pirating a book that could have been bought at a bookstore was reasonably necessary".[9]

28.    As increasingly recognized, the wholesale ingestion of creative works (such as

---

[6]    Murray Stassen, Suno [has] admitted training its AI on copyrighted music[.], *Music Business Worldwide* (Oct. 22, 2024), available at https://www.musicbusinessworldwide.com/suno-with-a-500m-valuation-has-admitted-training-its-ai-on-copyrighted-music-it-just-named-timbaland-as-a-strategic-advisor1/ (quoting a RIAA spokesperson), last accessed September 1, 2025

[7]    *See* also *Authors Guild, Inc. v. Google, Inc.,* 804 F.3d 202, 208–10 (2d Cir. 2015), where *Google Books* involved copying to serve the limited purpose of enabling searching. The court found that purpose to be distinct from the purpose of the copied works. *Id.* at 217-18. In other words, the purpose of copying the books was not to then create competing books in the exact same marketplace. Accordingly, the court determined that Google's copying could not serve as a substitute for the copied works, finding that Google's search function did not "provid[e] the public with a substantial substitute for matter protected by the [p]laintiffs' copyright interests in the original works or derivatives of them." *Id.* at 207.

[8]    *Authors Guild v. Google, Inc.* at 220-21.

[9]    *Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, at *18-19 (N.D. Cal. June 23, 2025) (Order on Fair Use).

Plaintiffs', Class Members', and Subclass Members' songs) to train an AI model is unlawful without express permission.

29.     In *Kadrey v. Meta Platforms, Inc.*, the court explained, "companies have been unable to resist the temptation to feed copyright-protected materials into their models without getting permission from the copyright holders or paying them for the right to use their works for this purpose. This case presents the question **whether such conduct is illegal**." In *Kadrey*, the court found that in most cases "the answer will likely be yes."[10] (Emphasis added)

30.     The court went on to emphasize that "it is generally illegal to copy protected works without permission" and that the fair use doctrine "typically doesn't apply to copying that will significantly diminish the ability of copyright holders to make money from their works (thus significantly diminishing the incentive to create in the future)."[11]

31.     Not only does a robust and long-used licensing system exist today for businesses like Udio to utilize, but independent artists heavily rely on licensing, streaming, and synchronization opportunities to monetize their music.

32.     As just one example, and for last year alone, Spotify reported paying ten billion ($10,000,000,000) dollars in music royalties to artists and rightsholders, a large portion of said royalties belonging to independent artists, according to Spotify.[12]

33.     Udio's unauthorized uses undermine the existing streams of revenue, including licensing markets, for independent music, which the Copyright Office itself recognized as valid and protectable under copyright law.[13]

34.     Feasible, voluntary, opt-in licensing models for AI training already exists,

---

[10]   *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC, slip op. at 1 (N.D. Cal. June 25, 2025).
[11]   *Id.*
[12]   Loud and Clear Economics Report, March of 2025: https://loudandclear.byspotify.com/.
[13]   *See* Report at 107.

demonstrating there is no necessity to engage in wholesale, unlicensed scraping.

35. Content licensing is a new potential market for licensing uses of composition and sound recording rights, and companies such as ElevenLabs (an AI music generator business similar to Udio) are premiering a forthcoming "Pro" model trained on music licensed from Merlin and Kobalt representing artists and writers who expressly opt in.[14]

36. This type of ethical, opt-in licensing demonstrates that AI companies can build powerful models while fully respecting copyright law and compensating creators, directly undercutting any argument that wholesale, unauthorized scraping of music is necessary for innovation.

37. Plaintiffs, Class Members, and Subclass Members own the two (2) sides of their songs, both the compositions and the sound recordings.

38. Udio not only scraped them, copied them, stored them, and used them without permission, but upon information and belief, infringing works produced by Udio are substantially similar, if not exactly identical, to the songs of Plaintiffs', Class Members, and Subclass Members.

39. Udio has yet to disclose these "publicly available" platforms, but upon information and belief, Udio acquired many of the songs it ingested into its AI training model(s) by downloading them directly from streaming platforms such as YouTube and Spotify.

40. To obtain these works, Udio engaged in "stream ripping," a form of piracy that circumvents encryption, authentication, and other digital rights management (DRM) technologies, thereby bypassing technological protection measures designed to prevent unauthorized accessed to the underlying media.

---

[14]  ElevenLabs Launches AI Music Model, Signs Licenses with merlin & Kobalt: Here's How It Will Work, Billboard Pro (August 5, 2025), available at https://www.billboard.com/pro/elevenlabs-ai-music-model-merlin-kobalt-licenses-details/, last accessed September 2, 2025

41.     These acts not only violated the terms of service of those platforms but also directly enabled Udio to build its training dataset from copyrighted works without authorization.

42.     Although Udio denies its AI model(s) have replicated any particular songs contained in its AI model(s) training dataset, the evidence tells a different story.

43.     Independent sources have repeatedly identified instances where Udio's outputs are not merely in the style of existing works but actually contain verbatim or near-verbatim excerpts of pre-existing songs, including outputs that imitate the voices of the artists performing on those songs.

44.     These outputs include reproductions of melodies, lyrics, instrumentals, and even full passages indistinguishable from the originals.

45.     These re-creations of popular melodies, lyrics, and instrumentals are commonly understood in the music industry to be "interpolations" – meaning to take something old and to input into something new.

46.     The interpolation of the songs belonging to Plaintiffs, Class Members, and Subclass Members, as well as the use and recreation of their voices, into unauthorized derivative works unfairly competes and violates copyright law.

47.     By reproducing of Plaintiffs', Class Members', and Subclass Members' voices — whether exactly or in substantially similar form—Udio created outputs that are likely to cause confusion regarding authorship, collaboration, sponsorship, or endorsement, thereby engaging in unfair competition.

48.     The revenue obtained through this exploitation of Plaintiffs', Class Members', and Subclass Members' songs and voices constitutes unfair competition, as Udio profited from the misappropriation of Plaintiffs', Class Members', and Subclass Members' exclusive rights and

goodwill without compensation or permission.

49.    Plaintiff Justice is an independent country music artist, selling over 100,000 albums and earning over 21,000,000 YouTube views.

50.    Plaintiff Justice has additionally amassed a substantial following on social media platforms as he has invested substantial time and money into bringing awareness around his music.

51.    Plaintiff Justice has received millions of streams on his songs on music platforms such as Spotify, such as his hit song "Last of the Cowboys" which has already received over eight million (8,000,000) streams.

52.    Plaintiff Justice has incredibly built a sustainable career even while serving as a full-time truckdriver in the United States.

53.    Plaintiff Justice's independently created songs have not only resonated with millions of listeners but are valuable intellectual property belonging exclusively to Plaintiff Justice.

54.    5th Wheel Records is a recording company owned and operated by Plaintiff Justice. To better protect his intellectual property, many of Plaintiff Justice's songs are registered under his music business entity, 5th Wheel Records, including those in Exhibit A hereto.

55.    My Heartland is a publishing company owned and operated by Plaintiff Justice. To better protect his intellectual property, many of Plaintiff Justice's songs are registered under his music business entity, My Heartland, including those in Exhibit A hereto.

56.    Plaintiffs and Class Members are independent recording artists and entities owned or controlled by such independent recording artists who hold U.S. copyright registrations for songs licensed on music streaming services.

57.    Plaintiffs, Class Members, and Subclass Members not only monetize their songs but also look for voluntary free-market licensing opportunities as part of their music business

operations.

58.     Plaintiffs, Class Members, and Subclass Members hold International Standard Recording Codes ("ISRCs") uniquely identifying their songs.

59.     Subclass Members, whether due to financial hardship, physical or technological limitations that prevent them from completing the registration process, or other barriers such as lack of access to a computer or reliable internet, have not obtained formal U.S. copyright registrations.

60.     Subclass Members are not asserting federal copyright infringement claims but nonetheless own and control valuable songs that they actively distribute and exploit in the relevant marketplace, including through voluntary licensing opportunities as part of their music business operations.

61.     Defendant Udio is a generative AI service that creates digital music based on user prompts, typically within seconds.

62.     Although Udio makes a certain, limited amount of free use available to users, Udio charges many of its users monthly fees for increased use of its website platform Udio.com, which includes accessibility from a mobile application (collectively hereafter the "Udio Website"), and which produces digital music files designed to mimic human-made songs (hereafter "AI Music").

63.     Udio has effectively admitted willful copyright infringement on a massive scale. In response to the Lawsuit, Udio admits to training its AI model on "publicly available" music. Publicly available music encompasses a large volume, if not by far the majority, the music of independent artists, including the copyrighted music of Plaintiffs, Class Members, and Subclass Members.

64.     Upon information and belief, one such "publicly available" platforms includes

YouTube available at https://www.youtube.com.

65.    Upon information and belief, other publicly available platforms, which are yet to be disclosed by Udio.

66.    The platform(s) identified above—whether through a free tier or subscription—do not authorize mass reproduction or ingestion of songs for commercial AI training, nor for the unauthorized access of the underlying audio or audio-visual files contained therein.

67.    Plaintiffs' copyrighted songs can be found on all major music streaming platforms, as well as through Plaintiffs' own website, tonyjustice.com (the "Justice Website").

68.    Class Members and Subclass Members additionally distribute their songs through major music streaming platforms as well as their own websites.

69.    Udio copied Plaintiffs', Class Members', and Subclass Members' songs from located on the open internet.

70.    Udio trained its AI model on the songs belonging to Plaintiffs, Class Members, and Subclass Members.

71.    Without the unlawful copying of Plaintiffs', Class Members', and Subclass Members' songs and ingesting them into its AI model(s), Udio's service would not be able to produce the product that the Udio Website offers today to over one million (1,000,000) users.

72.    Udio's AI specifically trains on the expressive features (i.e., the emotional and passionate aspects) of these copyrighted songs for the ultimate purpose of usurping the listeners, fans, and potential licensees of the songs it copied.

73.    Upon information and belief, Udio used and/or accessed streaming services on which Plaintiffs and Class Members had licensed their copyrighted songs to illegally copy and reproduce Plaintiffs' and Class Members' songs for purposes of training its generative AI

model(s).

74.    Upon information and belief, over one year ago Udio's program was already creating ten (10) tracks a second—more than six million (6,000,000) songs per week—through Udio's many users.[15] Udio never even attempted to seek permission from and give credit to the millions of independent artists and other rightsholders whose works make the Udio Website even possible, including the songs of Plaintiffs, Class Members, and Subclass Members.

75.    Udio profits substantially from its infringement of Plaintiffs', Class Members', and Subclass Members' copyrighted songs.

76.    Udio has secured Ten Million Dollars ($10,000,000.00) from investors,[16] with user subscription tiers as high as Twenty-Four Dollars ($24.00) per month for its highest subscription tier.

77.    That massive financial success would not have been possible without the independent artist songs that Udio copied to train its AI model, including copyrighted songs owned by Plaintiffs, Class Members, and Subclass Members.

78.    As discussed, Udio cannot avoid liability for its willful copyright infringement by claiming fair use.

79.    While the fair use doctrine allows for the unlicensed (i.e. illegal) use of copyrighted works in very limited circumstances, none of the fair use exceptions apply to Udio, even according to the U.S. Copyright Office.

80.    Plaintiffs, Class Members, and Subclass Members seek to hold Udio accountable

---

[15]    *See* Music Business Worldwide, *The Train Has Left the Station: AI Music Platform Udio Is Already Spitting Out 10 Songs a Second*, May 13, 2024, https://www.musicbusinessworldwide.com/the-train-has-left-the-station-ai-music-platform-udio-is-already-spitting (last viewed June 13, 2025).
[16]    *See* Music Business Worldwide, *Labels in Licensing Talks with AI Music Generators Suno and Udio (Report)*, June 2, 2025, https://www.musicbusinessworldwide.com/universal-warner-and-sony-in-talks-to-license-ai-music-generators-suno-and-udio-report (last viewed June 13, 2025).

for the misappropriation of their songs.

81.    Through both reproducing Plaintiffs' and Class Members' songs without license to train its AI model and through making new derivative works from their songs, Udio has violated under the Copyright Act exclusive rights held by Plaintiffs' and Class Members to copy and reproduce their songs, including the right to prepare derivative works.

82.    By reproducing Plaintiffs', Class Members' and Subclass Members' personas, voices, trademarks, likeness, signatures, brands, producer tags, and samples without license into the infringing works, Udio unfairly competed against Plaintiffs, Class Members, and Subclass Members and was unjustly enriched.

83.    For clarity, Plaintiffs, Class Members, and Subclass Members do not assert that *every* output generated by Udio's AI model is an infringing work of their songs.

84.    Plaintiffs' claim is that *some* Udio-generated outputs are infringing works, verbatim or near-verbatim reproductions of Plaintiffs', Class Members', and Subclass Member songs (in part or in whole).

85.    Udio is liable for each and every output "sound-alikes," voice impersonations, and other infringing works that actually copied protected expression and/or publicity rights of Plaintiffs, Class Members, and Subclass Members.

86.    As set forth below, evidence exists that Udio's AI model(s) has generated exact or nearly exact versions of Plaintiffs', Class Members', and Subclass Members' songs.

87.    Independent third parties have documented and demonstrated that these are not isolated accidents but an actually occurring result of Udio's AI model.

88.    By this amended complaint, Plaintiffs, Class Members, and Subclass Members bolster their allegations of such copying and misappropriation and make clear that Udio's creation

of the infringing works infringes Plaintiffs' rights in their songs containing both sound recordings and their underlying musical compositions, including their rights in derivative works of those recordings and compositions.

## **THE PARTIES**

89.     Plaintiff Justice is an independent country music artist who resides in the State of Tennessee.

90.     Plaintiff Justice is engaged in the business of creating, producing, manufacturing, distributing, selling, licensing, and otherwise commercializing his own original sound recordings in the United States and the world through various multi-media.

91.     5th Wheel Records is a Tennessee corporation in good standing with a principal office at 262 W. Broadway Blvd., Jefferson City, Tennessee 37760-2313. 5th Wheel Records publishes and/or administers musical compositions and sound recordings written by or associated with Plaintiff Justice and related catalogs, and holds or controls rights in such compositions and sound recordings, including those identified in Exhibit A.

92.     My Heartland is a Tennessee limited liability company with its principal office at 262 W. Broadway Blvd., Jefferson City, Tennessee 37760-2313. My Heartland publishes and/or administers musical compositions and sound recordings written by or associated with Plaintiff Justice and related catalogs, and holds or controls rights in such compositions and sound recordings, including those identified in Exhibit A.

93.     Plaintiffs hold copyrights to sound recordings and compositions that Plaintiff Justice created.

94.     As a holder of sound recording copyrights, Plaintiffs have exclusive control over rights in their copyrighted sound recordings, which have significant economic value.

95.     A non-exhaustive list of specific sound recordings owned or exclusively controlled

by Plaintiffs that Udio has, upon information and belief, illegally copied and reproduced is attached as Exhibit A.

96.    Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings listed in Exhibit A.

97.    Defendant Uncharted Labs, Inc. d/b/a Udio is a Delaware corporation with its principal place of business at 750 Lexington Avenue, Floor 9, New York, New York 10022.

## JURISDICTION AND VENUE

98.    This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, et seq., and the Music Modernization Act, 17 U.S.C. § 1401. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

99.    This Court has personal jurisdiction over Defendant Udio because its principal place of business, listed as 750 Lexington Avenue, Floor 9, New York, New York 10022, is located within this district.

100.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Udio resides in this district.

## FACTUAL BACKGROUND

101.    Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable songs. Exhibit A, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Udio has directly infringed (the "Copyrighted Recordings").

102.    As a musical artist, Plaintiff Justice invested years cultivating an all-American unique image, musical style and lyrical form that has garnered a large and loyal fan base.

103.    Plaintiff Justice is even credited as creating a new genre of "trucker music."

104.    Plaintiffs have made substantial investments in the creation, development and promotion of their musical catalogs and styles.

105.    Like Plaintiffs, Class Members, and Subclass Members are music recording artists who own or exercise exclusive control over their copyrights and/or exclusive rights in and to countless songs.

106.    Like Plaintiffs, the Class Members and Subclass Members have licensing deals and have invested in the creation, development and promotion of their music catalogs and brands.

107.    Subclass Members have released and commercially exploited their songs through recognized distribution channels and streaming platforms, but, due to financial hardship, physical or technological limitations that prevent them from completing the registration process, or other barriers such as lack of access to a computer or reliable internet, they have not obtained formal U.S. copyright registrations for their works.

108.    Subclass Members are not asserting federal copyright infringement claims under the Copyright Act. Instead, they seek relief under causes of action under the law of the State of Tennessee for unfair competition based upon Udio's unauthorized commercialization of their brands, personas, likeness, and songs in the training of Udio's AI model.

109.    Plaintiffs, Class Members, and Subclass Members have made substantial investments in their creative careers, cultivating unique musical identities and catalogs that embody their artistic contributions.

110.    Udio's exploitation of Plaintiffs', Class Members', and Subclass Members' songs has deprived them of the opportunity to license and monetize their music in the free market, while allowing Udio to unjustly capture commercial value from their creative output without consent,

license, or compensation.

111.    Udio's conduct constitutes misappropriation of Plaintiffs', Class Members', and Subclass Members' artistic identities.

112.    By copying and using their songs, brands, and voices without authorization, Udio diverted the economic value and goodwill those creators for Udio's own commercial enterprise.

113.    Upon information and belief, and consistent with the basic facts of how generative AI works, the content Udio used to "train" its AI model includes Plaintiffs' copyrighted songs, as well as copyrighted songs belonging to the Class Members and Subclass Members, that Udio reproduced without permission.

114.    Udio launched its public AI music generation platform in or about April of 2024.

115.    Users of Udio's service prompt the AI model to create music in various styles, mimicking particular instruments, genres, or even specific artists.

116.    David Ding ("Ding), Udio's CEO and co-founder, has explained that the only way Udio can "get high-quality outputs" is if it "trains[s] on a large amount of publicly-available and high-quality music."[17]

117.    Ding going on to say that Udio's model is trained on the "best quality music that's out there."[18]

118.    Ding explained that Udio trained its model on "good music" that Udio "obtained from the internet."[19]

---

[17] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/, last accessed October 10, 2025.
[18] Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), https://fortune.com/2024/05/17/ai-music-training-scraped/, last accessed October 10, 2025.
[19] Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/, last accessed October 10, 2025.

119.    In truth, it is now evident what public data means in this context: Udio copied Plaintiffs', Class Members', and Subclass Members' songs *en masse* from the Internet and fed them into its AI training pipeline.

120.    As one of Udio's chief investors has explained, "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably large amount of content, much of which . . . will be subject to copyright.[20]

121.    Understanding that no record exists of Udio ever attempting to properly license or purchase songs from Plaintiffs, Class Members, or Subclass Members, it appears Udio's very business plan was premised on specifically not obtaining licenses or permissions for the music it used to train its AI model(s).

122.    Udio could *not* have built a model capable of "look-alike" songs so similar to Plaintiffs' copyrighted songs and the copyrighted recordings of the Class Members and Subclass Members without the initial act of copying those recordings.

123.    Since the launch of the Udio Website, many allegations have arisen of Udio AI songs resembling or otherwise almost exactly mimicking pre-existing songs on "publicly accessible platforms."

124.    Because of their sheer popularity and exposure, Plaintiffs' copyrighted songs and the copyrighted songs of the Class Members and Subclass Members had to be included within Udio's training data for Udio's model to be successful at creating the desired human-sounding AI Music outputs.

125.    CEO Ding has said Udio's intention is to create "music that sounds indistinguishable from music that's created by professional human producers."[21]

---

[20] Comments of a16z in Response to Notice of Inquiry on Artificial Intelligence & Copyright 5 (Oct. 30, 2023).
[21] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally

126.    In furtherance of this objective, Udio copied the songs and relevant underlying elements therein designed to entertain, evoke emotion, and cultivate passion.

127.    CEO Ding has stated he believes Udio "could simplify a lot of the rights management" issues inherent in sampling music – the process of incorporating a section of a sound recording into a new recording."[22]

128.    This "simplifying" of the sampling process and sidestepping normal artist sampling licensing agreements would mean – and does mean – using Udio to circumvent copyright laws and an established sampling licensing business altogether.

129.    Udio seems to believe this is yet another opportunity to steal from music creators and obtain something with a significant value for nothing.

130.    This is further evidenced in the newly discovered information that Udio downloaded and scraped songs from streaming platforms, such as YouTube.

131.    Downloading or scraping recordings from streaming platforms such as YouTube—whether through a free tier or by paying a subscription fee—constitutes unlawful access and copying, which the Digital Millennium Copyright Act ("DMCA") is specifically drafted to protect against in the digital age.

132.    YouTube, through its own Terms of Service, expressly prohibit this kind of conduct by its users via its Terms of Service (as discussed further herein), but YouTube additionally employs encryption and other technological efforts to try and prevent piracy of just this kind.

133.    Accessing a platform pursuant to consumer-facing terms of service does not confer

---

(Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/, last accessed October 10, 2025.

[22] Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/, last accessed October 10, 2025.

a license to reproduce or mass-ingest songs for commercial AI training to create an exact competing product.

134.    To the contrary, the terms of music streaming platforms prohibit such uses, and Udio's wholesale reproduction of songs from those sources is unlawful and the circumvention of copyright protection systems as defined in 17 U.S.C. § 1201.

135.    By using voice data to train its AI model, Udio misappropriated the value of Plaintiffs', Class Members', and Subclass Members' identities, denied them attribution, and enabled the commercial exploitation of their works without credit or compensation.

136.    By ingesting Plaintiffs', Class Members', and Subclass Members' songs into Udio's AI model(s), Udio deprived them of monetization, commercialization and licensing opportunities.

137.    During AI training, entire audio files are downloaded and stored (often in intermediate caches or libraries) so that the model can analyze them.

138.    The U.S. Copyright Office's Report confirms that "whatever the source, copies are made - often repeatedly" during the AI training process.[23]

139.    Each of those acts of copying is infringement unless authorized.

140.    Here, no Plaintiff, Class Member, or Subclass Member ever authorized Udio to download, store, reproduce, or otherwise use their songs for any purpose.

141.    Udio's mass copying thus infringed Plaintiffs' and Class Members' reproduction rights.

142.    Moreover, as explained below, Udio's subsequent use of those copies to generate new music implicates additional rights, including the rights to create derivative works and to

---

[23]    U.S. Copyright Office, Copyright and Artificial Intelligence: Part 3 – Generative AI Training p. 26 (Pre-Publication Report, May 9, 2025)

distribute copies to the public.

143.    Plaintiffs' copyrighted songs and the copyrighted songs of the Class Members and Subclass Members were all available on the streaming services and the open internet during the applicable time Udio trained its AI Model(s).

144.    The songs of Plaintiffs, Class members, and Subclass Members were, by Udio's own admissions, without question used in the training of Udio's model.

145.    Udio offers both free and paid versions of the Udio Website for the creation of AI Music.

146.    According to Udio's terms of service on the Udio Website, both free and paid users can use the AI Music for commercial purposes without restriction, with an additional requirement for free users to give credit to Udio.[24]

147.    The fact that Udio's AI model(s) has been documented on several separate occasions, and by different sources, mimicking—whether substantially or exactly—the songs and voices contained in pre-existing songs, supports the conclusion that Udio's AI model(s) produced infringing works containing the songs—whether in whole or in part—belonging to Plaintiffs, Class Members, and Subclass Members.

148.    These outputs also evidence that Udio copied songs belonging to Plaintiffs, Class Members, and Subclass Members into its AI training dataset.

149.    The existence of exact or nearly exact outputs copying pre-existing songs evidences Udio's intentional copyright infringement, as well as misappropriation of the accompanying voices and associated with those songs belonging to Plaintiffs, Class Members, and Subclass Members.

---

[24]  Udio Website, *Pricing* (June 30, 2024), https://www.udio.com/pricing (last viewed June 13, 2025); Udio Website, *Terms of Service*, ¶ 6.4 (Last Revised on May 16, 2025), https://www.udio.com/terms-of-service (last viewed June 13, 2025).

150.    By reproducing these distinctive identifiers, Udio has not only copied the underlying recordings but also unfairly competed by exploited the personal and commercial identities of Plaintiffs, Class Members, and Subclass Members, diverting their value into Udio's own product without attribution, license, or compensation.

**Specific Allegations as to Each Registered Work in Exhibit A**

151.    Plaintiffs own *18 Gears to Life* — sound recording and musical composition; U.S. Copyright Office Reg. No. SR0000940659.

152.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *18 Gears to Life* from an internet available source.

153.    Upon information and belief, Udio stored *18 Gears to Life* on a digital device accessible non-transitory storage medium.

154.    Upon information and belief, Udio utilized *18 Gears to Life* in its training dataset for its AI model(s).

155.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *18 Gears to Life* in its AI model(s) datasets, caches, checkpoints, and weights.

156.    Upon information and belief, Udio continues to store *18 Gears to Life* on a digital device accessible non-transitory storage medium.

157.    Plaintiffs own *A Merry Trucking Christmas* — sound recording and musical composition; Reg. No. SRu001456089.

158.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *A Merry Trucking Christmas* from an internet available source.

159.    Upon information and belief, Udio stored *A Merry Trucking Christmas* on a digital device accessible non-transitory storage medium.

160.    Upon information and belief, Udio utilized *A Merry Trucking Christmas* in its training dataset for its AI model(s).

161.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *A Merry Trucking Christmas* in its AI model(s) datasets, caches, checkpoints, and weights.

162.    Upon information and belief, Udio continues to store *A Merry Trucking Christmas* on a digital device accessible non-transitory storage medium.

163.    Upon information and belief, *Life on 18 Whe*els — sound recording and musical composition; Reg. No. SR0000940595.

164.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Life on 18 Wheels* from an internet available source.

165.    Upon information and belief, Udio stored *Life on 18 Wheels* on a digital device accessible non-transitory storage medium.

166.    Upon information and belief, Udio utilized *Life on 18 Wheels* in its training dataset for its AI model(s).

167.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Life on 18 Wheels* in its AI model(s) datasets, caches, checkpoints, and weights.

168.    Upon information and belief, Udio continues to store *Life on 18 Wheels* on a digital device accessible non-transitory storage medium.

169.    Plaintiffs own *War Paint* — sound recording and musical composition; Reg. No. SRu001504667.

170.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *War Paint* from an internet available source.

171.    Upon information and belief, Udio stored *War Paint* on a digital device accessible non-transitory storage medium.

172.    Upon information and belief, Udio utilized *War Paint* in its training dataset for its AI model(s).

173.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *War Paint* in its AI model datasets, caches, checkpoints, and weights.

174.    Upon information and belief, Udio continues to store *War Paint* on a digital device accessible non-transitory storage medium.

175.    Plaintiffs own *West Coast Turnaround* — sound recording and musical composition; Reg. No. SR0000940660.

176.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *West Coast Turnaround* from an internet available source.

177.    Upon information and belief, Udio stored *West Coast Turnaround* on a digital device accessible non-transitory storage medium.

178.    Upon information and belief, Udio utilized *West Coast Turnaround* in its training dataset for its AI model(s).

179.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *West Coast Turnaround* in its AI model(s) datasets, caches, checkpoints, and weights.

180.    Upon information and belief, Udio continues to store *West Coast Turnaround* on a digital device accessible non-transitory storage medium.

181.    Plaintiffs own *Wild Days* — sound recording and musical composition; Reg. No. SR0000940492 ("*Wild Days '492*").

182.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Wild Days '492* from an internet available source.

183.    Upon information and belief, Udio stored *Wild Days '492* on a digital device accessible non-transitory storage medium.

184.    Upon information and belief, Udio utilized *Wild Days '492* in its training dataset for its AI model(s).

185.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Wild Days '492* in its AI model(s) datasets, caches, checkpoints, and weights.

186.    Upon information and belief, Udio continues to store *Wild Days '492* on a digital device accessible non-transitory storage medium.

187.    Plaintiffs own *Wild Days* — sound recording and musical composition (alternate registration/version); Reg. No. SR0000941484. ("*Wild Days '484*").

188.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Wild Days '484* from an internet available source.

189.    Upon information and belief, Udio stored *Wild Days '484* on a digital device accessible non-transitory storage medium.

190.    Upon information and belief, Udio utilized *Wild Days '484* in its training dataset for its AI model(s).

191.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Wild Days '484* in its AI model(s) datasets, caches, checkpoints, and weights.

192.    Upon information and belief, Udio continues to store *Wild Days '484* on a digital device accessible non-transitory storage medium.

193.    Plaintiffs own *Center Lane Larry* — sound recording and musical composition;

Reg. No. SRu1496009 (Mar. 7, 2022).

194.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Center Lane Larry* from an internet available source.

195.    Upon information and belief, Udio stored *Center Lane Larry* on a digital device accessible non-transitory storage medium.

196.    Upon information and belief, Udio utilized *Center Lane Larry* in its training dataset for its AI model(s).

197.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Center Lane Larry* in its AI model datasets, caches, checkpoints, and weights.

198.    Upon information and belief, Udio continues to store *Center Lane Larry* on a digital device accessible non-transitory storage medium.

199.    Plaintiffs own *Long Distance Love* — sound recording and musical composition; Reg. No. SRu1451987.

200.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Long Distance Love* from an internet available source.

201.    Upon information and belief, Udio stored *Long Distance Love* on a digital device accessible non-transitory storage medium.

202.    Upon information and belief, Udio utilized *Long Distance Love* in its training dataset for its AI model(s).

203.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Long Distance Love* in its AI model(s) datasets, caches, checkpoints, and weights.

204.    Upon information and belief, Udio continues to store *Long Distance Love* on a

digital device accessible non-transitory storage medium.

205.    Plaintiffs own *Song of My People* — sound recording and musical composition; Reg. No. SR0000944803.

206.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Song of My People* from an internet available source.

207.    Upon information and belief, Udio stored *Song of My People* on a digital device accessible non-transitory storage medium.

208.    Upon information and belief, Udio utilized *Song of My People* in its training dataset for its AI model(s).

209.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Song of My People* in its AI model(s) datasets, caches, checkpoints, and weights.

210.    Upon information and belief, Udio continues to store *Song of My People* on a digital device accessible non-transitory storage medium.

211.    Plaintiffs own *Driving in a Downpour* — sound recording and musical composition; Reg. No. SR0000944279.

212.    Upon information and belief, Udio downloaded or otherwise obtained one or more partial or complete digital copies of *Driving in a Downpour* from an internet available source.

213.    Upon information and belief, Udio stored *Driving in a Downpour* on a digital device accessible non-transitory storage medium.

214.    Upon information and belief, Udio utilized *Driving in a Downpour* in its training dataset for its AI model(s).

215.    Upon information and belief, Udio's AI model(s) continues to have memorized representations of *Driving in a Downpour* in its AI model(s) datasets, caches, checkpoints, and

weights.

216.    Upon information and belief, Udio continues to store *Driving in a Downpour* on a digital device accessible non-transitory storage medium.

## The United States Copyright Office Report

217.    As noted, the United States Copyright Office recently released its Pre-Publication Version of its Report on generative AI training in May of 2025.[25]

218.    The United States Copyright Office administers the nation's copyright laws and through its work, the United States Copyright Office "is committed to helping fulfill copyright's Constitutional purpose and to promote creativity and free expression for the benefit of all."[26]

219.    "The Register of Copyrights is the principal advisor to Congress on national and international copyright matters, testifying upon request and providing ongoing leadership and impartial expertise on copyright law and policy."[27]

220.    The Report indicates that Udio's use of Plaintiffs' and the Class Members' copyrighted songs violates copyright protections.

221.    Specifically, the Report states that "The steps required to produce a training dataset containing copyrighted works clearly implicate the right of reproduction."[28]

222.    With respect to this copying, the Report states, "Developers make multiple copies of works by downloading them; transferring them across storage mediums; converting them to different formats; and creating modified versions or including them in filtered subsets.

223.    In many cases, the first step is downloading data from publicly available locations,

---

[25]    United States Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training*, https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf (last viewed June 11, 2025)
[26]    United States Copyright Office, "About," https://www.copyright.gov/about/ (last viewed June 11, 2025).
[27]    *Id*.
[28]    Report at 26.

but whatever the source, copies are made—often repeatedly."[29]

224.    According to the Report, "Most commenters agreed with or did not dispute that copying during the acquisition and curation process implicates the reproduction right."[30]

225.    Udio downloaded the songs of Plaintiffs, Class Members, and Subclass Members to train its generative AI model.

226.    Udio used the copyrighted songs of Plaintiffs and the Class Members to train its generative AI model(s).

227.    With respect to training and whether this creates a claim for copyright infringement, the Report states, "The training process also implicates the right of reproduction. First, the speed and scale of training requires developers to download the dataset and copy it to high-performance storage prior to training. Second, during training, works or substantial portions of works are temporarily reproduced as they are 'shown' to the model in batches. Those copies may persist long enough to infringe the right of reproduction, depending on the model at issue and the specific hardware and software implementations used by developers. Third, the training process— providing training examples, measuring the model's performance against expected outputs, and iteratively updating weights to improve performance—may result in model weights that contain copies of works in the training data. If so, then subsequent copying of the model weights, even by parties not involved in the training process, could also constitute prima facie infringement."[31]

228.    Meaning, as it relates to Plaintiffs and Class Members, the process in which Udio's AI model trains, through the reproduction and copying of existing copyrighted songs, constitutes prima facie copyright infringement.

---

[29]    *Id.*
[30]    *Id.* at 27.
[31]    *Id.* at 27–28.

229.    With respect to similarities between Udio's infringing works that are similar to Plaintiffs' and Class Members' copyrighted songs, the Report states that a "lookalike" end product evinces that the generative AI model is in fact storing and utilizing the copyrighted songs.

230.    This matters for music creators who never gave permission to Udio, because their songs are now stored in the neural network of Udio's AI, and cannot be retrieved, deleted, or scrubbed from Udio's use.

231.    The Report goes on to note that "a specific model can generate verbatim or substantially similar copies of a training example, without that expression being provided externally in the form of a prompt or other input, it must exist in some form in the model's weights."[32]

232.    Meaning, AI, without robust filters, can and has replicated with near exactness copies of copyrighted songs, even with limited prompts or inputs by a Udio user.

233.    This was also evidenced in thousands of instances by the major labels in their pending Lawsuit against Udio.

234.    In the Report, the Copyright Office opined that "[t]here is a strong argument that copying the model's weights implicates the right of reproduction for the memorized examples. Like other digital files that encode or compress content using mathematical representations, the content need not be directly perceivable to constitute a copy."[33]

235.    Moreover, the Report states, "Since model weights are lists of numbers that do not change (barring further training), they are fixed, and because memorized works can be generated and displayed using software, those works can be perceived or reproduced with the aid of a

---

[32]    *Id.* at 28.
[33]    *Id.*

machine."[34]

236.    When a generative AI model such as Udio's produces "near exact replicas" of sound recordings, the Report states "[s]uch outputs likely infringe the reproduction right and, to the extent they adapt the originals, the right to prepare derivative works."[35]

237.    The Report concluded by emphasizing that the fair use doctrine *does not* excuse unauthorized training on expressive works (e.g., music) *particularly when those works are used to generate substitutional outputs* that may replace the originals in the relevant marketplace.[36]

238.    Here, Udio training its AI model on independent music without authorization, including the copyrighted songs of Plaintiffs and the Class Members, to then create competing music in the exact same marketplace, is unlikely to be considered fair use, and is therefore prima facie copyright infringement.

**Udio's Outputs Resemble and Outright Replicate Artists' Songs and Vocals**

239.    After training its AI model(s) on Plaintiffs', Class Members', and Subclass Members' songs, Udio deployed its AI model(s) to generate new AI Music.

240.    Separate independent sources show that Udio's outputs often closely imitated or replicated existing songs and replicates artists' vocals.

241.    The striking similarity between Udio's AI outputs and well-known classic songs is so pronounced that it is difficult to appreciate fully without listening to the recordings themselves. In other words, the Udio AI songs sound so shockingly close to the originals that you must hear it to believe it.

242.    Public evidence corroborates that Udio's AI model(s) were trained on, and

---

[34]    *Id.* at 28–29.
[35]    *Id.* at 31.
[36]    *Id.* 107-108.

reproduces, Plaintiffs', Class Members', and Subclass Members' songs and vocals.

243.    On April 18, 2024, Ed Newton-Rex, the Chief Executive Officer of the ethical-AI nonprofit *Fairly Trained* and a long-time researcher in generative-AI music systems, published an investigative article entitled *"Yes… Udio's Output Resembles Copyrighted Music, Too."* This article documents numerous instances where Udio's outputs bear striking melodic, harmonic, lyrical, and stylistic similarities to well-known pre-existing songs.[37]

244.    In his analysis, Newton-Rex demonstrated that Udio's Website produced a song virtually identical to ABBA's *"Dancing Queen."* Using a prompt referencing "a famous 1970s pop song about queens who dance, by a Swedish band that rhymes with fabba," Udio generated an AI song entitled "Prancing Monarch." The generated phrase "we can jive" mirrors the corresponding phrase "you can jive" in *Dancing Queen* with the same melody, rhythm, upward melodic figure, and multi-voice harmonies. Newton-Rex observed that such similarity "is not to mention the sound of the voices," which emulate the timbre of the original performers.[38]

245.    Using prompts referencing *The Beatles*, Udio likewise produced multiple outputs that recreate the melody, harmonic progressions, and rhythmic contours of *Yesterday*. The generated vocal line reproduces the signature supertonic-major to subdominant-to-tonic progression characteristic of the original composition, including the syncopated cadence aligning with the syllable "-day." Another Udio AI song reproduces the rhythmic phrasing of the lyric "yesterday, all my troubles seemed so far away," confirming that the model memorized and can re-render distinctive musical sequences from Plaintiffs', Class Members', and Subclass Members'

---

[37] *Yes… Udio's Output Resermbes Copyrighted Music, Too.*, Music Business Worldwide, April 18, 2024, located at https://www.musicbusinessworldwide.com/yes-udios-output-resembles-copyrighted-music-too/, last accessed October 10, 2025.
[38] *Id.*

catalogs.[39]

246.    When prompted to generate "a song from 1997 by an Australian singer … the song is called *Torn*," Udio produced a track that replicated the chorus of Natalie Imbruglia's *Torn*, including identical five-pitch sequences found in the original's refrain ("I'm all out of faith / I am ready torn"). The melodic intervals, rhythmic spacing, and phrasing corresponded precisely to those of the original work.[40]

247.    Newton-Rex also confirmed that Udio automatically generated copyrighted lyrics from multiple songs - including *Yesterday* (The Beatles), *Tiny Dancer* (Elton John), *Hotel California* (The Eagles), *Yellow* (Coldplay), *Dancing Queen* (ABBA), and *Wonderwall* (Oasis)— even when users did not input the lyrics themselves. In these cases, the system's default lyric-generation function reproduced verbatim or near-verbatim copyrighted lyrics, notwithstanding Udio's supposed "artist filters." One Udio output contained Coldplay's lyrics to *Yellow* even after the model's filters allegedly removed the artist's name from the prompt.[41]

248.    The investigation further revealed that Udio generates songs emulating the style and sonic character of well-known recording artists. Prompts referencing "a song that directly samples three (3) famous songs by a band that rhymes with Kloasis" produced outputs mimicking *Oasis*; prompts invoking "a band that rhymes with Boldplay" yielded outputs in Coldplay's distinctive melodic and harmonic style; and additional prompts resulted in productions echoing the voices or arrangements of *Tom Petty*, *The Beatles*, and *Bladee*. Such stylistic replication would be impossible absent ingestion of the corresponding copyrighted recordings into Udio's training data.[42]

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*

249.    Newton-Rex observed that some of these outputs included both music and lyrics from protected works, demonstrating that Udio's AI model "was almost certainly trained on copyrighted music and text without authorization." He concluded that "Udio generates output with a striking resemblance to copyrighted music… across melody, chords, style, and lyrics," and that the model's behavior "is best explained by training on copyrighted material."[43]

250.    Other examples are documented by the major record labels in their Lawsuit. For starters, using the prompt "my tempting 1964 girl smokey sing hitsville soul pop" and excerpting lyrics from the band The Temptations, Udio's Website generated an AI song entitled "Sunshine Melody," which instantly sounds like the song, "My Girl". The AI "My Girl" reflects a number of significant similarities, including a very similar melody, the same chords, and very similar backing vocals.[44]

251.    As another example, Udio's generated an AI song with striking resemblance to Green Day's hit, "American Idiot". Using the prompt "pop punk american alternative rock California 2004 rob Cavallo" and portions of Green Day lyrics, Udio generated "Subliminal Hysteria," an AI song that shares many similarities with the Green Day original. In particular, the melody accompanying the line "don't want a nation under the new media" is identical to the corresponding phrase in the original, while the melody accompanying the line "the subliminal mindf*ck America" is virtually identical to the corresponding phrase in the original.[45]

252.    A Udio AI output, "Sway With Me" draws on another popular hit, Michael Bublé's "Sway". Generated using the prompt "canadian smooth male singer 2004 jazz pop buble sway latin big band mambo," this Udio AI song contains a melody that significantly resembled the Bublé

---

[43] *Id.*
[44] *See UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 24-04777, Complaint, Doc. No. 1, § 55 (S.D.N.Y., Filed June 24, 2024).
[45] *Id.* at 56.

original. In particular, the AI song replicated in several places almost verbatim the original's distinctive melody on the words "start to play, dance with me, make me sway."[46]

253.    Udio's Website also generated twelve (12) different outputs that contain portions of Mariah Carey's "All I Want for Christmas is You". As just one example, also entitled "All I Want For Christmas is You," was generated on Udio's service with Mariah Carey lyrics and the prompt "m a r i a h c a r e y, contemporary r&b, holiday, Grammy Award-winning American singer/songwriter, remarkable vocal range." The AI song contained chords and a melody that is virtually identical to the original on every line except "I don't care about the presents underneath the Christmas tree," which is still clearly in the original recording's style. The 11 other AI songs also include clear stylistic elements of the original sound recording and Mariah Carey's voice, as well as melodic similarities.[47]

254.    From within the independent music creator community itself, a number of creators observed similar Mariah Carey soundalikes and came to the same conclusion that Udio must have trained on Mariah Carey songs.[48] In the Sync My Music exposé, the creator reveals multiple examples where, without any influence from the prompter as to the melodies, the resulting AI songs all suspiciously contained melodies that matched the "All I Want For Christmas is You" lyrics from the original.[49]

255.    Udio responded to these examples by claiming that the creator "simply exploited a bug in the system that we already fixed." However, this copying is a cornerstone of Udio's service, not a "bug."[50]

---

[46] *Id*. at 57.
[47] *Id*. at 58.
[48] *See* Sync My Music, *Is Udio Reproducing Copyrighted Songs? (Audio Examples)*, YouTube (May 15, 2024) at 5:23–8:00, https://www.youtube.com/watch?v=FTiVr986yuk.
[49] Lawsuit, *Supra*, ¶ 58.
[50] *Id*. at 59.

256.    Udio's Website has also generated AI songs resembling other major holiday hits. For example, the melody of Brenda Lee's "Rocking Around the Christmas Tree" was contained in a Udio AI song, "Holly Jolly Christmas Wish"; Bobby Helms's "Jingle Bell Rock" was directly referenced in Udio's AI song, "Jingle Bell Swing"; a portion of Wham!'s "Last Christmas,", was captured in Udio's AI song, "Once Heartbroken"; and a portion of Andy Williams' "It's the Most Wonderful Time of the Year" appeared within Udio's AI song, "Season of Cheer."[51]

257.    Sync My Music additionally documented almost a dozen (12) Udio AI songs contained a portion of Wham!'s "Last Christmas", as well as Udio AI songs containing "Feliz Navidad" by José Feliciano.[52]

258.    The Udio AI song entitled "The Final Bow" unmistakably evokes the Frank Sinatra classic "My Way." Using the prompt "jazz frank Jacques sinatra Revaux my way ballad 1969" along with Frank Sinatra's lyrics, Udio's system produced a recording featuring vocals that closely resemble Sinatra's distinctive voice. The output further exhibits multiple melodic similarities to the original work: the phrase "friend, I'll say it clear" follows an almost identical melodic contour; the phrases "and now the end is near" and "I did it my way" mirror the original melody with only minor variation; the melody accompanying "final curtain" is directly taken from the original but transposed upward by one step; and the phrase "much more than this" replicates the melodic line of "I'll say it clear" from the Sinatra recording.[53]

259.    Using the prompt "a 1983 song by an American singer and dancer, electronic, R&B, pop-rock, post-disco, funk," together with lyrics from Michael Jackson's "Billie Jean," Udio's Website generated an output that bears a clear resemblance to portions of the copyrighted recording

---

[51] *Id*. at 60.
[52] Sync My Music, *Supra*, at 8:01, 9:33.
[53] Lawsuit, *Supra*, at 61.

*Billie Jean*. Udio's version, titled "Midnight Denial," replicates the melodic structure of the original on the lyric phrase "Billie Jean is not my lover, she's just a girl who," maintaining a nearly identical rhythmic and pitch contour despite beginning on a different scale degree. Additional similarities to *Billie Jean* appear in another Udio output titled "Eternal Whisper," which exhibits a closely matching rhythmic pattern throughout the chorus and emulates the distinctive vocal timbre characteristic of Michael Jackson's performance.[54]

260.    Likewise, Udio's AI song entitled "Excitations" incorporates the distinctive vocal refrain "Round round, get around, I get around" in the same style and arrangement as The Beach Boys' copyrighted sound recording *I Get Around*. This output was generated using the prompt "song about vibrations, by an American rock band from Hawthorne, California, formed in 1961, vocal harmonies, surf," along with lyrics from The Beach Boys. Another Udio-generated track, "Good Vibrations," similarly reproduces the hallmark vocal harmonies found in the "Round, round, get around, I get around" section of the original recording, featuring a comparable high lead vocal and a melody on the phrase "I get around" that is virtually indistinguishable from the original.[55]

261.    In yet another example of an ABBA lookalike song by Udio, using the prompt "a famous 1970s pop song about queens who dance, by a Swedish band that rhymes with fabba, Europop, disco, keyboard, from an album that rhymes with jarrival," Udio generated an AI song entitled "Prancing Monarch," which bears a strong resemblance to ABBA's copyrighted recording *Dancing Queen*. In particular, the phrase "we can jive" in the Udio output closely mirrors the corresponding phrase "you can jive" in the original, reproducing the same melodic pitches, nearly identical rhythmic structure, and harmonizing vocals that are substantially indistinguishable from those in the ABBA recording.[56]

---

[54] *Id*. at 62.
[55] *Id.* at 63.
[56] *Id*. at 64.

262.    Udio's Website also generates audio outputs that contain vocals that are, in some instances, indistinguishable from those of famous recording artists. For example, the Udio-generated "Eve of New Lands" contains vocals that sound identical from Lin-Manuel Miranda's sound recordings for the Hamilton soundtrack. The output was generated using the prompt "my shot showtune revolutionary war lin manuel Miranda.[57]

263.    In other vocal duplication examples, the Udio-AI outputs entitled "Reveries of the Boss" and "Throne of Stone" contain vocals so similar to those of Bruce Springsteen that even a dedicated listener would struggle to distinguish them from the genuine artist. Udio's Website produced *Reveries of the Boss* using the prompt "rock, heartland rock, melodic, sentimental song like Bruce Springsteen, male vocalist," and generated *Throne of Stone* using the prompt "create a song by an artist that rhymes with Truce Stringbean."[58]

264.    Beyond its imitation of *Billie Jean*, Udio's service has generated outputs containing digital replicas of Michael Jackson's voice from distinct periods of his career. Using the prompt "male vocal Motown song about my girl," Udio produced a track titled *Hello to My Queen*, featuring vocals that closely resemble those of a young Michael Jackson. Another prompt - "1990s pop, king of pop" - caused Udio's system to generate an additional output titled *Echo's Dance*, which emulates the vocal characteristics and style of an older Michael Jackson with striking similarity.[59]

265.    Additional testing of Udio's service reveals numerous outputs that replicate the distinctive vocal qualities, musical phrasing, and stylistic signatures of well-known recording artists across multiple genres. For instance, Udio generated *Ain't No Sunshine Can Revive (feat.*

---

[57] *Id*. at 65.
[58] *Id*. at 66.
[59] *Id.* at 67.

*Billie Holiday)* in a style indistinguishable from Billie Holiday's jazz-blues recordings; a surf-rock track emulating *The Beach Boys*; *Love Sting'z* mirroring Sting's smooth vocal tone and melodic phrasing; *Round the Firelight* reproducing the timbre and delivery of Johnny Cash; and *Stellar Alignment* reflecting Coldplay's distinctive harmonic and production style. Other Udio outputs, including *Leviathan's Plea* (resembling Jon Anderson of Yes), *Echos of Yesterday* (emulating The Beatles), *Dawning Triumph* (imitating Michael Bublé), and *Navidad Alegre* (echoing José Feliciano), further demonstrate that Udio's AI model can—and does—generate audio performances virtually indistinguishable from those of iconic artists.[60]

266.    Publicly available data confirm that even Udio's CEO Ding, has personally used the service to generate songs explicitly "in the style of The Beatles." One such track appeared on his public Udio profile, notwithstanding the company's statements that it removes artist names from prompts to prevent imitation.[61] The CEO's own generation of Beatles-style music underscores that Udio's model is capable of reproducing—and its leadership is aware of—outputs that emulate protected artistic expression.

267.    Taken together, these independent findings corroborate Plaintiffs', Class Members', and Subclass Members' own testing and establish that Udio's AI model(s) were trained on and reproduce Plaintiffs', Class Members', and Subclass Members' songs and vocals.

268.    The reproducibility of melodies, harmonies, lyrics, and artist-specific vocal timbres cannot be explained by coincidence; it is direct evidence of wholesale copying of Plaintiffs', Class Members', and Subclass Members' catalogs to train Udio's commercial generative-music system.

**AI Overfitting**

269.    AI experts document the occurrence of "overfitting" in AI models resulting in the

---

[60] *Id.* at 68.
[61] *Yes… Udio's Output Resembles Copyrighted Music, Too*., Supra.

regurgitations of the original training data.

270.    *Overfitting* is the technical term for a model reproducing chunks of its training examples (i.e., regurgitating its data set in outputs).

271.    Overfitting is defined by learning training examples too intricately, so that it "fits (memorizes) the training set so tightly that the model replicates data" rather than making new data."[62]

272.    When an AI model is overfit, it may literally spit out parts of its training data rather than produce new output.

273.    In the generative AI architecture, the type of verbatim or near-verbatim training data output is usually called "regurgitation."

274.    One of the trustworthy glossaries explains that memorization (partial recall of items word-for-word) is a form of "partial regurgitation," while regurgitation, on the other hand, is when [a model] repeats verbatim textual parts from [its] training data."[63]

275.    Even though Udio's output is sound rather than text, the pattern is the same: Udio is generating copyrighted sounds it was taught in training.

276.    Udio's generation of music creator vocals and underlying compositions of their songs into new AI Music could be this very failure mode, if not specifically by Udio's design for its AI model(s).[64]

277.    These examples of Udio's outputs qualify as new versions based on the old,

---

[62]    Overfitting, in Machine Learning Crash Course, Google for Developers, https://developers.google.com/machine-learning/crash-course/overfitting/overfitting, last visited September 1, 2025.

[63]    Data, in Yeong Zee Kin, Nature of Data in Pre-Trained Large Language Models, FPF (July 6, 2025), https://fpf.org/blog/nature-of-data-in-pre-trained-large-language-models/ (last visited Sept. 1, 2025).

[64]    The Intended or Common Behavior, in Cbresciano, A Technical Critique of Jacqueline Charlesworth's "Generative AI's Illusory Case for Fair Use", Medium (Jun. 23, 2025), https://medium.com/@cbresciano/a-technical-critique-of-jacqueline-charlesworths-generative-ai-s-illusory-case-for-fair-use-3aef5bf20107 (last visited Sept. 1, 2025).

commonly referred to in the music industry as "interpolations".

278.    By lifting distinctive melodies, or arrangements from existing songs and re-presenting them in slightly altered form, Udio's AI is engaging in the same practices that have long required licenses in traditional music production.

279.    This method, to "interpolate" something old into something new, indeed requires specific licensing.

280.    Here, however, Udio's AI model(s) appear to interpolate various elements from Plaintiffs', Class Members', and Subclass Members' songs without authorization, embedding them into its model and reproducing them at scale under the guise of "AI-generated" output.

281.    Given the bold admission by CEO Ding that Udio's intention is to create "music that sounds indistinguishable from music that's created by professional human producers", combined with the mounting evidence of its outputs, Plaintiffs, Class Members, and Subclass Members have a good-faith basis to believe that Udio always intended to take and recreate their works without authorization or compensation in order to create the best AI Music possible.

282.    Udio intentionally structured its AI model to generate AI Music designed to mirror the very songs it trained on - including the underlying compositions and vocal performances.

283.    Plaintiffs, Class Members, and Subclass Members further have a good-faith basis to believe that, just as Udio has reproduced classic catalog works verbatim or nearly verbatim, it has likewise generated unauthorized derivative works, samples, and identifiers drawn from the music of Plaintiffs, Class Members, and Subclass Members.

**Udio Downloaded Songs from YouTube**

284.    Upon information and belief, Udio obtained a significant number of songs in its training data by unlawfully downloading them from various music platforms, including the website

YouTube, located at www.youtube.com ("YouTube").

285.    Udio unlawfully accessed the audio and audio-visual files through a method of music piracy called "stream ripping".

286.    YouTube is the second most visited website in the world, after Google.

287.    YouTube users are able to stream (*i.e.*, view) audiovisual content (the "videos"), but are *not* permitted to make permanent, unrestricted copies of the videos (or any songs contained in those videos) through YouTube.

288.    Plaintiffs, Class Members, and Subclass Members upload and/or distribute their songs to their YouTube channels and other music platforms (collectively the "Protected Platforms").

289.    Protected Platforms each contain robust terms of service that define prohibited conduct and actions to be taken by the Protected Platforms to safeguard songs of users.

290.    Plaintiffs, Class Members, and Subclass Members, as the exclusive owners of their songs, rely on these Protected Platforms terms of service, which promise to keep their songs under lock and key, unless users otherwise lawfully gain access to those songs in compliance with the applicable terms of service.

291.    When distributing their songs to the Protected Platforms, Plaintiffs, Class Members, and Subclass Members include information in the description for their videos containing their songs identifying copyright status, copyright management information, the name of the applicable music distributor, the name of the record label, if applicable, and other relevant information to the song(s).

292.    As it specifically relates to YouTube, YouTube's Terms of Service prohibit the

unauthorized use of the songs and videos available on its platform[65].

293.    While YouTube provides a limited download feature for paying subscribers, it does *not* permit downloading and making permanent, unrestricted copies of the videos or songs on or from YouTube.

294.    Meaning, YouTube takes measures to safeguard the audio and audio-visual file contained without its videos.

295.    In order to enforce this restriction, YouTube deploys an anti-circumvention procedure called "rolling cipher," which provides technical protection for YouTube's videos.

296.    Rolling cipher encryption controls access to YouTube videos by preventing external sites or services from directly downloading protected YouTube videos.

297.    YouTube maintains two (2) different URLs for any given video: 1) the "page URL", visible to YouTube users (which can be copied and pasted from a browser like Chrome), and 2) the "file URL", which is not visible to YouTube users, and is for the video file itself that is played within the page.

298.    The file URL is encrypted using a rolling cipher algorithm that is regularly changing and is specifically designed to stop external access of YouTube videos (e.g., downloading, copyright, distributing videos).

299.    The very purpose of the rolling cipher is to stop a YouTube user from gaining access to the files themselves contained within the videos as permanent, unrestricted downloads.

300.    Despite the rolling cipher safeguard and restrictions set forth in the YouTube Terms of Service, there are numerous "stream-ripping" tools available on the open internet that enable

---

[65]    YouTube, "Terms of Service," https://www.youtube.com/static?template=terms, last accessed September 21, 2025. 1. *See Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) ("[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying.").

the unauthorized downloading of videos and songs from YouTube with just a click of a button.[66]

301.    Use of these stream-ripping tools to circumvent YouTube's rolling-cipher measure independently violates copyright law.[67]

302.    Just weeks ago, *Billboard* exposed Udio's illegal scraping of songs on YouTube, after the international music publishing trade association (ICMP) shared exclusive evidence with Billboard regarding the unlawful conduct by Udio.[68]

303.    Udio's unauthorized extraction, copying, and storage of Plaintiffs', Class Members', and Subclass Members' songs from YouTube for use in its training data was accomplished by Udio's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of YouTube's videos and songs.

304.    Udio's actions constitute a breach of the Digital Millennium Copyright Act's (DMCA) anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."[69]

305.    These facts evidence that Udio did not lawfully license or otherwise obtain access to the songs of Plaintiffs, Class Members, and Subclass Members, but instead accessed their songs on a piracy basis by circumventing YouTube's technological protection measures through stream

---

[66]    *Stream-Ripping Is Next Frontier for Piracy Wars*, The Hollywood Reporter, December 4, 2020, accessible at https://www.hollywoodreporter.com/business/business-news/stream-ripping-is-next-frontier-for-piracy-wars-4099909/, last accessed September 21, 2025.

[67]    *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").

[68]    R. Smirke, *'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music*, Billboard, Sept. 9, 2025, available at https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/, last accessed September 21, 2025.

[69]    17 U.S.C. § 1201(a)(1)(A).

ripping.

306.    Moreover, and in order to gain access to what Plaintiffs, Class Members, and Subclass Member believe to be millions of songs, Udio had to traffic in circumvention technology directly in violation of the DMCA anti-circumvention protections.

307.    By unlawfully extracting and copying copyrighted sound recordings from YouTube in violation of both its Terms of Service and the DMCA's anti-circumvention provisions, Udio knowingly ingested Plaintiffs', Class Members', and Subclass Members' songs into its training data without authorization, compensation, or consent.

308.    This conduct confirms that Udio's dataset is soiled with piracy and misappropriation, and that Udio's commercial exploitation of its AI-generated outputs rests on systematic theft of the music of Plaintiffs, Class Members, and Subclass Members.

**Udio Does Not Qualify For Fair Use**

309.    As it relates to Protected Platforms and Suno's intentional circumvention of TPMs in order to gain unauthorized access to the songs of Plaintiffs', Class Members', and Subclass Members' songs, the fair use doctrine is not a defense to such a violation, as 17 U.S.C. § 1201(a) creates a new access control right independent from copyright infringement[70]

310.    As it relates to fair use as a defense to Plaintiff and Class Members' copyright infringement counts, Suno additionally cannot claim fair use.

311.    Udio cannot claim "fair use" when it comes to the issues in this case.

312.    Fair use is about determining whether the illegal use of another's copyrighted work

---

[70] *See* MDY Industries, LLC v. Blizzard Entertainment, Inc., 629 F.3d 928, 950–52 (9th Cir. 2010) (§1201 creates rights distinct from copyright infringement and does not require a copyright registration); *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193–94 (Fed. Cir. 2004) (§1201 establishes a cause of action independent from copyright infringement); *See also Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147, 1170 (C.D. Cal. 2018) (a plaintiff need not allege infringement to state a claim under DMCA's anti-circumvention provision).

is "fair," and therefore permissible.[71]

313.    The intentional theft of allegedly millions of songs created by independent music makers is appalling, wrong, unjustified and certainly not fair. Udio's conduct violates the very purposes of the copyright law and runs contrary to the purpose of the fair use doctrine.

314.    Pursuant to the Copyright Act, 17 U.S.C. § 107, fair use may exist related to "criticism, comment, news reporting, teaching . . . scholarship, or research."

315.    These allowances under fair uses reflect the policy of ensuring the purpose of the Copyright Act, which is to promote the progress of art and science by real human authors.

316.    Udio's wholesale copying of countless songs owned by independent artists, Plaintiffs, and Class members serves none of these purposes, and was simply done for commercial gain by Udio.

317.    In furtherance of this commercial gain objectives, Udio copied Plaintiffs' and the Class Members' expressive music catalogs, specifically designed to evoke emotion and passion, in order to create AI music, an exact competing product.

318.    Udio is unable to argue any functional purpose for its AI model to ingest the copyrighted songs of Plaintiffs and the Class Members, other than to create new, competing AI Music.

319.    Pursuant to 17 U.S.C. § 107, the four factors of the fair use doctrine are: (1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) The nature of the copyrighted work; (3) The amount and substantiality of the portion used; and (4) The effect of the use upon the potential market for or value of the copyrighted work.

---

[71]    *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984).

320.    Here, the use is far from transformative, as there is no functional purpose for Udio's AI model(s) to ingest Plaintiffs', Class Members', and Subclass Members' songs for a commercial purpose. Udio derives a financial benefit proportional to the number of music files it generates, further weighing the first fair use factor against it.[72]

321.    The second fair use factor also favors Plaintiffs. This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'"[73]

322.    There is no doubt that the copyrighted songs of Plaintiffs and the Class Members are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes."[74]

323.    So too does the third fair use factor weigh against fair use. "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original."[75]

324.    Udio admits it copied songs wholesale, which includes the most important parts of the protected songs, which is evident in AI Music's ability to recreate and mimic not only the most recognizable musical phrases, hooks, and choruses in popular music history (as also argued by major record labels in their Lawsuit against Udio), but also the songs created by Plaintiffs and Class Members.

325.    Udio then uses these copies of key elements of protectable expression to generate AI Music that resemble the copyrighted songs of Plaintiffs and the Class Members it copied.

---

[72]  *Andy Warhol Found. For the Visual Arts., Inc.,* 598 U.S. at 532-3.
[73]  *TCA TV Corp. v. McCollum,* 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).
[74]  *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).
[75]  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).

326.    As it relates to the fourth factor, Udio's use of copyrighted songs of Plaintiffs and the Class Members poses a significant threat to the market for and value of those copyrighted songs. Even the U.S. Copyright Office affirmed that music licensing is a critical aspect of music ownership, and Plaintiffs and the Class Members certainly license their copyrighted recordings as part of their business models.

327.    The U.S. Copyright Office Report is consistent with the above analysis, expressly acknowledging that the first and fourth factors are the most significant in evaluating fair use in the context of generative AI training.[76]

328.    Udio's Website has the potential to generate directly competing AI Music at such speed that it risks overrunning the market for human-made sound recordings.

329.    So much so that music streaming platform Deezer reports that nearly a third of all tracks uploaded to Deezer are now fully AI-generated (almost 33%).[77]

330.    The first factor evaluates whether the use is transformative, meaning, it adds something new, not merely supersedes the original. Udio not only exploited independent music for a commercially competing product, but Courts have held, which the Copyright Office reiterates, that copying for a substantially similar expressive purpose, such as generating derivative content that competes in the exact same market, is not transformative and weighs against fair use.[78]

331.    On the other hand, the fourth factor assesses whether the use causes harm to the actual or potential market for the original work. Meaning, if Udio's use causes harm to independent artists by negatively impacting the existing music market for artists' music, such findings weigh

---

[76]    Report at 74.
[77]    Nearly A Third of All Tracks Uploaded To Deezer Are Now Fully AI-Generated, Says Platform, Music Business Worldwide, September 11, 2025, available at https://www.musicbusinessworldwide.com/nearly-a-third-of-all-tracks-uploaded-to-deezer-are-now-fully-ai-generated-says-platform/, last accessed September 22, 2025.
[78]    Report at 45–46 ("Training a model to generate outputs that are substantially similar to copyrighted works... is hard to see as transformative") (Citation removed).

against fair use.

332.    Notably, the Copyright Office's report strongly cautions that: "Using copyrighted works to create outputs that serve as substitutes…" in fact would be directly harmful to the relevant marketplace and therefore weighs heavily against fair use.[79]

333.    Udio's unauthorized use of the copyrighted songs of Plaintiffs and the Class Members threatens to eliminate the existing market for licensing songs, as well as the future markets for licensing songs to generative AI companies.

334.    However, this decision to license one's songs to AI companies is a deeply personal one, and not one that should be forced upon a creator without their knowledge or consent.

335.    As already noted, Udio's own CEO Ding admits its very goal is to "get high-quality outputs," which is can do if it "train[s] on a large amount of publicly-available and high-quality music."

336.    In order to compete with the best music in the world, Udio's model, is trained on the "best quality music that's out there," according to CEO Ding.

337.    The many examples of Udio's outputs replicating "publicly available" songs and features, including vocal performances, refutes Defendants' refutes Udio's defense that these infringements are "transformative" works of fair use.

338.    A use is *not* transformative when it simply republishes or repackages the original work and brings no new expression.

339.    Here, Udio's AI model(s) have time and again literally copied protected elements of pre-existing songs, doing the opposite of transforming them.

340.    By definition, a work that simply regurgitates original, recognizable sound from a

---

[79] *Id.*

pre-existing work constitutes ordinary infringement rather than a transformative use.

341.    Courts and commentators have likewise cautioned that AI programs seeking to output something that substitutes the input are not making protected transformative use of it but rather are functioning as unlicensed engines of duplication.[80]

342.    Simply put, Udio's exact reproductive use of original sound points toward ordinary infringement and not toward new meaning or fair use.

343.    Plaintiffs, Class Members, and Subclass Members therefore reasonably, and with a good-faith basis, assert that Udio's AI model has generated outputs using their own songs, voices, and other underlying intellectual property rights.

344.    The repeated instances of near-verbatim reproductions of well-known songs and identifiers establish that Udio's AI model is capable of, and in fact does, regurgitate protected material from its training data.

345.    It is therefore reasonable to assert that the works of Plaintiffs, Class Members, and Subclass Members - each of whom has had music made publicly available online - have been subject to the same unlawful copying and misappropriation.

346.    Plaintiffs and Class Members will never be able to claw back their songs that Udio used to train its AI.

347.    Meaning, the training dataset is unable to be purged from Udio's AI model.

348.    Once AI ingests copyrighted music, those songs are stored in its neural network, and not capable of deletion or retraction.

349.    These acts by Udio were abuse and exploitation of another's intellectual property

---

[80]    Jason Koebler, AI Music Generator Suno Admits It Was Trained on 'Essentially All Music Files on the Internet', *404 Media* (Aug. 1, 2024), https://www.404media.co/ai-music-generator-suno-admits-it-was-trained-on-essentially-all-music-files-on-the-internet/ (last visited Sept. 1, 2025).

of the worst kind.

350.    Rather than license copyrighted songs like every other tech-based business is required to do, Udio elected to simply steal the songs of Plaintiffs, Class Members, and Subclass Members to then generate AI-soundalike music at virtually no cost to Udio.

351.    There are existing licensing avenues available to Udio, a business that has raised millions of dollars from investors, but failed to pay for the songs that make the Udio Website possible.

## CLASS ACTION ALLEGATIONS

352.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

353.    Plaintiffs propose the following Class definitions, including subclasses (collectively, "the Class"), subject to amendment as appropriate:

A.    **Registered Works Class — All persons and entities who own or control U.S.-registered copyrights in sound recordings and/or musical compositions that were made available on internet-based streaming services since January 1, 2021, and whose works were copied, ingested, or used by Uncharted Labs, Inc. to train, validate, fine-tune, or operate its AI music-generation systems without authorization.**

B.    **Registered Works (Injunctive) Class — All members of the Registered Works Class seeking injunctive and declaratory relief prohibiting Udio from copying, retaining, or using their registered works (including intermediate caches/weights/checkpoints) and requiring reasonable remedial measures to prevent future use.**

C.    **DMCA Class — All persons and entities who own or control sound recordings or musical compositions that were made available on digital streaming platforms employing technological protection measures (including, without limitation, YouTube and Spotify), and whose works were accessed, copied, or ingested by Udio through circumvention of such technological protection measures, without authorization.**

D.    **DMCA (Injunctive) Class — All members of the DMCA Class seeking injunctive and declaratory relief under 17 U.S.C. § 1203 to bar future circumvention and**

require deletion/cessation of use of materials obtained by circumvention.

E. **Foreign Works Subclass — All persons and entities who are nationals or residents of countries that are parties to the Berne Convention or other applicable international copyright treaties pursuant to 17 U.S.C. § 104(b), who own or control copyrights in sound recordings and/or musical compositions that were made available on internet-based streaming services since January 1, 2021, and whose works were copied, ingested, or used by Udio to train, validate, fine-tune, or operate its AI model(s) without authorization.**

F. **Tennessee Resident Artist Subclass — All natural persons who were Tennessee residents at the time of filing and who created, performed, or produced original musical works made publicly available online, and whose names, voices, likenesses, producer tags, or other identifying elements of artistic persona were misappropriated, used, or exploited by Uncharted Labs, Inc. in connection with the development, training, marketing, or operation of its AI music-generation platform, without authorization or compensation since January 1, 2021.**

354.    Excluded from the Class are Udio's officers and directors, and any entity in which Udio has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Udio. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

355.    Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

356.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs estimate that there are thousands of Class Members.

357.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Udio copied, ingested, stored, or otherwise reproduced Plaintiffs' and Class Members' sound recordings and musical compositions without authorization;

b.  Whether Udio's conduct infringes Plaintiffs' and Class Members' exclusive rights under the Copyright Act, including the rights of reproduction, distribution, and preparation of derivative works;

c.  Whether Udio circumvented technological protection measures on streaming platforms such as YouTube and Spotify in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201;

d.  Whether Udio's ingestion and use of Plaintiffs' and Class Members' works, personas, voices, producer tags, and other identifiers constitutes unfair competition, unjust enrichment, or misappropriation under applicable state law;

e.  Whether Udio's conduct constitutes unfair or deceptive acts or practices affecting trade or commerce in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq*.;

f.  Whether Udio acted willfully and knowingly in copying, ingesting, and exploiting Plaintiffs' and Class Members' works without authorization;

g.  Whether Udio's conduct deprived Plaintiffs and Class Members of licensing, monetization, and commercialization opportunities in the music marketplace;

h.  Whether Udio's outputs, including "sound-alike" works and reproductions of producer tags, voices, and other distinctive identifiers, are substantially similar to or derived from Plaintiffs' and Class Members' works;

    i.    Whether Udio's representations and marketing of its AI-generated music as "new" or "original" were deceptive and likely to cause confusion regarding origin, sponsorship, or affiliation;

    j.    Whether Udio has been unjustly enriched by retaining revenues, subscriptions, and increased company valuation resulting from its unlawful conduct;

    k.    Whether injunctive relief is necessary to prevent Udio from continuing to copy, retain, or exploit Plaintiffs' and Class Members' works and identities;

    l.    Whether Udio should be required to delete and destroy all unauthorized copies of Plaintiffs' and Class Members' works from its training datasets, caches, checkpoints, weights, and AI models;

    m.    The amount of statutory damages, actual damages, disgorgement, or restitution to which Plaintiffs and Class Members are entitled under the Copyright Act, the DMCA, the MMA (if applicable), and state law;

    n.    Whether Plaintiffs and Class Members are entitled to treble damages, multiple damages, attorneys' fees, costs, and pre- and post-judgment interest under applicable federal and state statutes; and

    o.    Such other questions of law or fact as may arise from Defendant's uniform course of conduct toward Plaintiffs and Class Members.

358.    These issues are common to the Class, and their resolution would advance matter and the parties' interests therein.

359.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Copyrighted material, like that of every other Class Member, was available on streaming services and therefore improperly used by Udio to train Udio's generative AI model for

commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Udio. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

360.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions.

361.    <u>Predominance</u>. Udio has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' Copyrighted material was unlawfully used by Udio in the same way. The common issues arising from Udio's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

362.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Udio. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class

member.

363.    Udio has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

364.    Finally, all members of the proposed Class are readily ascertainable.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### (Violation of 17 U.S.C. § 106(1))

365.    Plaintiffs and Class members repeat, reallege, and incorporate the allegations contained in the previous paragraphs as if fully set forth herein.

366.    Plaintiffs and the Class Members own or exercise exclusive control over rights in the federally copyrighted songs that Udio illegally copied, reproduced and used in training of its generative AI model and the development and production of the Udio Website to its customers. Plaintiffs and the Class Members have duly registered each of the Songs.

367.    Udio has knowingly and willfully infringed Plaintiffs' and the Class Members' exclusive rights in copyrighted songs, including but not limited to those songs identified in Exhibit A, by reproducing them in violation of 17 U.S.C. § 106(1).

368.    Udio does not have authorization, permission, license, or consent to reproduce or otherwise use the copyrighted songs of Plaintiffs and Class Members'.

369.    Upon information and belief, Udio used the copyrighted songs of Plaintiffs and the Class Members, including those identified in Exhibit A, to train its generative AI model, and to produce the output Udio offers to its customers.

370.    Each of Udio's acts of infringement of Plaintiffs' and Class Members' copyrighted songs is a willful violation of 17 U.S.C. § 106(1).

371.    As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION
### (Violation of 17 U.S.C. § 106(2))

372.    Plaintiffs and Class Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

373.    Plaintiffs and the Class Members own or exercise exclusive control over rights in the federally copyrighted songs (both the sound-recordings and compositions) that Udio has illegally copied, store, reproduced and used in training of its generative AI model and the development and production of the service Udio offers to its customers.

374.    Plaintiffs and the Class Members have duly registered each of the songs.

375.    Upon information and belief, Udio violated Plaintiffs' and Class Members' distribution rights by transmitting and distributing infringing outputs of their songs to Udio's millions of users.

376.    Upon information and belief, Udio's generative AI model produces near exact replicas or adapt the original versions of the copyrighted songs of Plaintiffs and the Class Members, the Report states "[s]uch outputs likely infringe the reproduction right and, to the extent they adapt the originals, the right to prepare derivative works.

377.    Udio knowingly induced, encouraged, and profited from infringing outputs containing the songs of Plaintiffs and Class Members distributed to users of the Udio platform.

378.    Udio has knowingly and willfully infringed Plaintiffs' and the Class Members'

exclusive rights in copyrighted songs, including but not limited to those sound recordings identified in Exhibit A, by using them to prepare derivative works based upon the copyrighted work in violation of 17 U.S.C. § 106(2).

379.    The derivative works prepared by Udio's generative AI system are central to the services Udio offers to its customers and constitute conduct by Udio itself.

380.    Udio does not have authorization, permission, license, or consent to use the copyrighted songs of Plaintiffs and Class Members to prepare derivative works.

381.    Upon information and belief, Udio used the reproductions of Plaintiffs and the Class Members, including those identified in Exhibit A, to train its generative AI model and to produce the output Udio offers to its customers.

382.    Each of Udio's acts of infringement of Plaintiffs' and Class Members' copyrighted songs is a willful violation of 17 U.S.C. § 106(2).

383.    As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

### THIRD CAUSE OF ACTION
**(Violation of the Digital Millennium Copyright Act,
17 U.S.C. § 1201 et seq.)**

384.    Plaintiffs, Class Members, and Subclass Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

385.    The Digital Millennium Copyright Act ("DMCA") prohibits the circumvention of technological measures that effectively control access to copyrighted works, 17 U.S.C. §

1201(a)(1), and prohibits trafficking in technology primarily designed for the purpose of circumventing such measures, 17 U.S.C. § 1201(a)(2).

386.    Plaintiffs, Class Members, and Subclass Members own or control songs that they made available on Protected Platforms, including YouTube.

387.    These services employ technological protection measures ("TPMs"), including encryption, authentication protocols, and digital rights management systems, to control access to the underlying songs.

388.    Upon information and belief, Udio circumvented these TPMs to unlawfully access, copy, and ingest the underlying audio and audio-visual files contained therein belonging to Plaintiffs', Class Members', and Subclass members into Udio's AI training dataset.

389.    Udio engaged in "stream ripping," which strips away Protected Platforms' encryption access controls, thereby bypassing protections that restrict consumers to authorized playback and prohibit mass downloading.

390.    By circumventing the Protected Platforms' TPMs, Udio unlawfully acquired complete copies of Plaintiffs' and Class Members' underlying audio and audio-visual files, including their songs, without license, authorization, or payment.

391.    These copies were stored, reproduced, and used to train, validate, and operate Udio's generative AI music model(s).

392.    Udio traffics in technology designed to circumvent TPMs designed to protect the underlying audio and audio-visual files contained with Protected Platforms in violation of the DMCA.

393.    Udio's circumvention was willful and intentional. Udio has publicly admitted that its training data includes "essentially all music files of reasonable quality accessible on the open

Internet," which necessarily includes songs protected by TPMs on the Protected Platforms.

394.    Plaintiffs, Class Members, and Subclass Members never authorized Udio to circumvent access controls on Protected Platforms or gain access to their audio and/or audio-visual files, including their songs.

395.    The Terms of Service of the Protected Platforms prohibit such mass ingestion and downloading, and Udio's circumvention of those restrictions violated 17 U.S.C. § 1201.

396.    As a direct and proximate result of Udio's violations of § 1201, Plaintiffs' and Class Members' have suffered injury, including loss of licensing revenue, diminished market value of their works, and deprivation of control over their protected content and identities.

397.    Udio's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs and Class Members.

398.    As a direct and proximate result of Udio's violations of 17 U.S.C. § 1201(a), Plaintiffs and Class Members are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Udio's profits from circumvention in amounts to be proven at trial, together with Plaintiffs' and Class Members' costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4)-(5).

## FOURTH CAUSE OF ACTION
### (Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq.)

399.    Plaintiffs and Subclass Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

400.    The Tennessee Consumer Protection Act ("TCPA") declares unlawful any unfair or deceptive act or practice affecting trade or commerce within the State of Tennessee. Tenn. Code

Ann. § 47-18-104(a).

401.    Plaintiffs and Subclass Members are Tennessee resident artists who have created, performed, and distributed songs on online platforms. These songs, along with their voices and artistic personas, represent valuable commercial goodwill.

402.    Udio engaged in unfair and deceptive acts and practices by misappropriating Plaintiffs' and Subclass Members' voices without consent, license, or compensation.

403.    Specifically, Udio ingested Plaintiffs' and Subclass Members' songs into its AI model(s) and used their distinctive identifiers - including their voices - to generate outputs that misappropriate their brands in order to directly compete with in the same marketplace.

404.    Udio deceptively marketed these outputs as "new" or "original," while concealing the fact that they were derived from misappropriated works and voices.

405.    Udio's unfair and deceptive conduct occurred, at least in part, in Tennessee, where Plaintiffs and Subclass Members reside, created their works, and experienced the injury. Udio's acts directly affected trade and commerce in Tennessee by diminishing the value of Plaintiffs' and Subclass Members' works and depriving them of licensing and monetization opportunities.

406.    Udio's violations of the TCPA were willful and knowing. Udio intentionally avoided licensing obligations, misrepresented the nature of its AI training practices, and exploited the reputations and goodwill of Tennessee artists to build its business.

407.    As a direct and proximate result of Udio's violations of the TCPA, Plaintiffs and Subclass Members have suffered ascertainable losses, including lost licensing fees, diminished streaming and synchronization revenues, erosion of market share, and damage to their personal brands and reputations.

408.    Pursuant to Tenn. Code Ann. § 47-18-109, Plaintiffs and the Tennessee Resident

Artist Subclass seek actual damages, treble damages for willful and knowing violations, attorneys' fees, costs, and appropriate injunctive relief to prevent further unfair or deceptive practices by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Udio as follows:

A.    Certification of the Classes: Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

B.    Declaratory Judgment: Declare that Defendant's acts and practices described herein violate the Copyright Act, the Digital Millennium Copyright Act, the Music Modernization Act (as applicable), the Tennessee Consumer Protection Act, and applicable common law doctrines including unfair competition, misappropriation, and unjust enrichment;

C.    Injunctive Relief: Preliminarily and permanently enjoin Defendant, its officers, agents, employees, successors, assigns, and all persons acting in concert with it, from:

1.    Continuing to copy, ingest, reproduce, distribute, or otherwise exploit Plaintiffs', Class Members', and Subclass Members' songs without authorization;

2.    Circumventing technological protection measures on streaming platforms, including but not limited to YouTube and Spotify;

3.    Using, retaining, or distributing any songs, datasets, caches,

checkpoints, weights, or other digital storage of Plaintiffs', Class Members', and Subclass Members' works within its AI models; and

4. Marketing or commercializing AI-generated outputs derived from Plaintiffs', Class Members', and Subclass Members' works without authorization or license;

D.    Remedial Measures: Order Defendant to delete, purge, and destroy all unauthorized copies of Plaintiffs', Class Members', and Subclass Members' works from its systems, including training datasets, intermediate storage, caches, checkpoints, and model weights, and to submit to third-party verification of such deletion;

E.    Damages Under the Copyright Act: Award Plaintiffs and the Registered Works Class all damages available under 17 U.S.C. § 504, including statutory damages for each infringed work, or, alternatively, actual damages and Defendant's profits attributable to the infringement;

F.    Damages Under the DMCA: Award Plaintiffs and the DMCA Class statutory damages under 17 U.S.C. § 1203(c)(3), actual damages, and Defendant's profits attributable to circumvention, as well as attorneys' fees and costs under § 1203(b)(4)-(5);

G.    Damages Under the MMA: Award Plaintiffs and the MMA Class (if applicable) statutory damages and other relief provided by 17 U.S.C. § 1401;

H.    Damages Under State Law: Award Plaintiffs and the Tennessee Resident Artist Subclass actual damages, treble damages for willful and knowing

violations under Tenn. Code Ann. § 47-18-109, attorneys' fees and costs, and such other relief as provided under the TCPA;

I.    Equitable Restitution and Disgorgement: Require Defendant to disgorge and make restitution of all ill-gotten gains, revenues, and profits derived from its unlawful conduct;

J.    Attorneys' Fees and Costs: Award Plaintiffs reasonable attorneys' fees, costs, and expenses as authorized by federal and state law, including but not limited to 17 U.S.C. §§ 505, 1203(b)(4)-(5), and Tenn. Code Ann. § 47-18-109;

K.    Pre- and Post-Judgment Interest: Award pre- and post-judgment interest as permitted by law; and

L.    Further Relief: Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

Dated: October 27, 2025

*/s/ Jarrett L. Ellzey*
Jarrett L. Ellzey, Texas Bar No. 24040864
*Pro Hac Vice Admission*
Leigh S. Montgomery, Texas Bar No. 24052214
*Pro Hac Vice Admission*
**EKSM, LLP**
4200 Montrose Bvld., Suite 200
Houston, Texas 77006
Telephone: (888) 350-3931
Facsimile: (888) 276-3455
jellzey@eksm.com
lmontgomery@eksm.com

*/s/ Krystle Delgado*
Krystle Delgado, AZ Bar No. 031219
*Pro Hac Vice Admission*
**Delgado Entertainment Law, PLLC**
6803 E Main St # 1116
Scottsdale, AZ 85251
Telephone: 480-248-0657
krystle@delgadoentertainmentlaw.com

Arkady Frehtkman
Frekhtman & Assoc.
60 Bay 26th Street
Brooklyn, NY 11214
arkady@866attylaw.com
Local Counsel

***Attorneys for Plaintiffs***

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2025 the foregoing instrument was served on all counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Jarrett L. Ellzey*
Jarrett L. Ellzey